**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0452n.06

No. 09-6192

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jul 23, 2010**
LEONARD GREEN, Clerk

ANGELA KAY CARRELLI,          )
                              )
    *Plaintiff-Appellant*,          )
                              )          ON APPEAL FROM THE
v.                            )          UNITED STATES DISTRICT
                              )          COURT FOR THE EASTERN
**COMMISSIONER OF SOCIAL SECURITY**,          )          DISTRICT OF TENNESSEE
                              )
    *Defendant-Appellee*.          )          **O P I N I O N**


BEFORE:    COLE and MCKEAGUE, Circuit Judges; MAYS, District Judge.[*]

    **COLE, Circuit Judge**. Plaintiff-Appellant Angela Carrelli seeks review of a district court's

decision affirming the decision of an administrative law judge ("ALJ") who denied her request for

social security disability benefits. Because substantial evidence supports the ALJ's decision, we

**AFFIRM**.

### I. BACKGROUND

**A.    Factual background**

    Carrelli is a high school graduate with an associate degree in nursing who previously worked

as a registered nurse. In August 2004, she applied for disability insurance benefits and supplemental

security income under Titles II and XVI of the Social Security Act, alleging that she had been unable

---

[*]The Honorable Samuel H. Mays, Jr., United States District Judge for the Western
District of Tennessee, sitting by designation.

to work since August 25, 2001, because of right piriformis syndrome, shoulder problems, chronic pain, headaches, digestive tract problems, depression, anxiety, and difficulty sleeping. The state agency denied her application initially and on reconsideration. She then requested an administrative hearing. At the time of the hearing, she was fifty years old, and she was fifty-one years old when the ALJ issued his decision.

1.      *Medical evidence*

In August 2001, Carrelli sought treatment for pain in her right hip and was given a cortisone injection. The injection gave her temporary relief, but her pain persisted, and, in September 2001, she sought medical assistance from Dr. David Hauge. Dr Hauge performed a neurological evaluation, found "a very miniscule disc bulge at the L5-S1 level on the left which [was] very, very subtle." (Administrative Record ("AR") 187.) Dr Hauge suspected that Carrelli suffered from piriformis syndrome—a neuromuscular disorder that occurs when the piriformis muscle, a narrow muscle located in the buttocks, compresses or irritates the sciatic nerve. The following month, in November 2001, Carrelli received another cortisone injection. Before the procedure, an examination showed normal strength, sensation, and deep tendon reflexes in both legs. Post-procedure, Carrelli reported positive results and was instructed to return for injections as needed.

In April 2002, still having hip pain, Carrelli underwent an electronyogram and a nerve-conduction study. The tests results were normal. Two months later, Carrelli consulted a pain specialist, Dr. Dennis Harris. His examination revealed that Carrelli had full range of motion and strength in her lower extremities, normal tone and movement, and the ability to walk on her heels and toes without difficulty. In addition, she had normal mood and affect as well as normal thought

content and thought process. Dr. Harris diagnosed chronic muscle pain and recommended aggressive physical therapy and epidural infusion. In August of that same year, Carrelli again saw Dr. Harris who administered an epidural infusion for her right hip. After the injection, she reported "good relief," and that she was "able to tolerate physical therapy treatments which helped improve her range of motion." (AR 210.)

At a follow-up visit with Dr. Harris in October 2002, Carrelli reported that she thought she made "some progress" and was "slowly progressing" with physical therapy three times per week. (AR 254.) However, she also reported left hip pain and "expressed frustration" that "she would never get better." (*Id.*) In addition, she requested another lower-back MRI. It showed only minor degenerative changes and a left-side disc bulge that was unchanged from previous MRIs.

An MRI of Carrelli's pelvis was taken several months later in February 2003. The MRI showed mild hypertrophy, or enlargement, of the right piriformis muscle, compared to the left. Dr. Glenn Jung, who read the MRI, concluded, however, that the "clinical significance of this [was] uncertain," and "[t]here [were] no other significant findings." (AR 520.) An August 2004 CT-scan of Carrelli's pelvis showed no abnormalities. In addition, a bone mineral content exam in September 2003 showed normal bone density in Carrelli's lumbar spine and borderline ostepenia (low bone density) in her left hip. The radiologist recommended follow-up in two to three years. When Carrelli had the recommended follow-up in March 2006, the test showed only mild bone density loss in her left hip.

During this time period, Carrelli also saw Dr. Paul Naylor, an orthopedic surgeon. In October 2004, Dr. Naylor wrote to Carrelli's attorney, explaining that Carrelli had chronic piriformis

syndrome and that he thought it was "not likely to get better." (AR 279.) He also thought "with a reasonable degree of medical certainty she [was] not going to be able to carry on as an RN . . . ." (*Id.*)

In addition to hip pain, Carrelli began reporting left shoulder pain in April 2003. An MRI showed mild hypertrophy, which produced minimal impingement of her shoulder, but no evidence of a complete rotator cuff tear. In March 2004, after Carrelli had experienced pain in her left shoulder for more than one year, Dr. Naylor diagnosed her with chronic shoulder pain. Later that month, he performed an arthroscopic surgical procedure on her left shoulder. In June 2004, Carrelli reported marked improvement. However, in December 2004, Carrelli felt a "pop" in her left shoulder after lifting a twelve-pound turkey. Despite the injury, Dr. Naylor concluded that Carrelli had good range of motion, and an MRI showed only slight irritation.

In January 2005, Dr. Jeffrey Summers, a consulting physician, examined Carrelli. Dr. Summers noted that Carrelli limped and favored her right leg but did not require an aid to walk. She also had mild difficulty rising from a seated position and getting on and off the examination table. Dr. Summers concluded that because of her hip pain, Carrelli would have difficulty sitting, standing, or walking for more than thirty minutes continuously or for more than six hours in a workday and would have difficulty squatting, kneeling, climbing, and stooping on a frequent basis. He also concluded, however, that she would otherwise be able to tolerate work-related activities in this regard. Because of her shoulder injury, Dr. Summers stated that Carrelli should avoid working overhead as well as reaching, pulling, pushing, lifting, or carrying greater than twenty pounds with her left arm, but otherwise, she should tolerate all other work-related activities in this regard.

Finally, Dr. Summers found Carrelli to be alert and oriented to person, place, time, and situation; he also found her cognitive function and intelligence to be commensurate with her formal education.

A few months later, in January 2005, Dr. Celia Gulbenk, a state agency physician, reviewed Carrelli's medical records. Dr. Gulbenk concluded that Carrelli could lift or carry up to twenty pounds occasionally and up to ten pounds frequently; was limited in her ability to push or pull with her lower extremities; could stand or walk for about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. The doctor also noted that Carrelli's allegations of pain were not "wholly credible." (AR 350.)

During that same month, at the state agency's request, psychologist Tracy Allred examined Carrelli. Dr. Allred noted that Carrelli suffered a "mixture of depression and anxiety symptoms due to circumstantial stresses in her life." (AR 340.) As a result, Dr. Allred found it difficult to differentiate mental health symptoms from medical symptoms. In addition, when questioned about prior mental health treatment, Carrelli was "not interested," denied current treatment, and denied taking any medication for mental health symptoms. (AR 338.) Dr. Allred and Carrelli discussed Carrelli's use of Lorazepam, but Carrelli insisted that it was prescribed for "other medical uses versus depression or anxiety." (AR 339.) Ultimately, Dr. Allred diagnosed anxiety and opined that Carrelli was moderately limited in her ability to understand and remember, to sustain concentration and persistence, to interact socially, and to adapt and tolerate work-related stress.

During the next month, February 2005, Dr. Larry Welch, a state agency reviewing psychologist, agreed with Dr. Allred's conclusions and further opined that Carrelli could understand,

remember, and complete detailed tasks on a regular and continual basis with occasional difficulty sustaining concentration, persistence, and pace. He also concluded that she could interact with others without difficulty, could adapt to a routine but not to frequent or fast-paced change, and could set and achieve most long-range goals with only occasional assistance.

That summer, in July 2005, neurologist Dr. Jack Scariano examined Carrelli. He noted that she was oriented to person, place, and time and that her mood and affect were appropriate to the situation. Her speech was appropriate and her recent and remote memory were intact. Her attention span and concentration were good as were her vocabulary, awareness of current events, and past history. Carrelli's touch, pin, and vibratory sensations were normal; she had full strength in all extremities; her balance was normal; and she had a normal gait, with normal heel-toe and tandem walking. She did, however, show marked spasms in her right piriformis muscles. Dr. Scariano diagnosed piriformis syndrome and recommended injections to relieve the pain.

The next year, in March 2007, Carrelli underwent piriformis-release surgery with Dr. Naylor. Piriformis-release surgery involves cutting the tendon of the muscle to relax it. At a follow-up visit two weeks later, Dr. Naylor noted that Carrelli's wound was healing and that she was "ambulating well." (AR 675.) Prior to the procedure, Dr. Naylor had completed a "Medical Source Statement of Ability to Do Work-Related Activities," in which he opined that Carrelli could not lift any weight; could not stand or walk at all; could not sit at all; was limited in her ability to push and pull her lower extremities; and could never climb, balance, kneel, crouch, crawl, or stoop.

In addition to specialists, Carrelli saw a general practitioner, Dr. Mancel Wakham, from September 2001 until November 2006. During that period, Dr. Wakham treated Carrelli for her hip

and shoulder injuries as well as other medical issues not related to this appeal. He referred her to specialists, regularly prescribed pain medications, and prescribed sleep aids and medications used to treat anxiety. In December 2003, Dr. Wakham wrote a brief letter opining that Carrelli's "medical disabilities are permanent in nature. Her physical limitations keep her from performing duties as a registered nurse or any other gainful employment." (AR 65.) Three years later, in December 2006, Dr. Wakham completed a "Medical Source Statement of Ability to Do Work-Related Activities," and opined that Carrelli could not lift any weight; could not stand or walk at all; could not sit at all; was limited in her ability to push or pull in her lower extremities; and could never climb, balance, kneel, crouch, crawl, or stoop.

2.      *Physical therapy*

Carrelli attended a series of physical therapy sessions for her right hip and left shoulder from May 2002 through November 2006. During these sessions, she set goals for herself and charted her progress. At an initial evaluation in April 2003, for instance, Carrelli's goals for the next four weeks of therapy included tolerating walking greater than 1.5 hours with decreased pain medication and increasing "overall functional status to allow her to drive a car and eventually return to work." (AR 600.) At a November 2004 initial evaluation, Carrelli reported that she was doing "fairly well" after her rotator cuff surgery. (AR 563.) She also reported continued pain in her right buttock, which left her unable to drive for long periods of time. Despite the pain, however, she continued to walk at a local track. At an initial evaluation in February 2006, Carrelli reported that she was having difficulty sitting or standing for long periods of time and that she could not sit for longer than one minute without have to shift positions.

**B.** **Procedural history**

      *1.*     *Administrative hearing*

An administrative hearing was held in May 2007. At the hearing, Carrelli testified that her hip was her most significant medical problem. She explained that she experienced spasms in her back, buttocks, and leg; had to change positions frequently; and could not sit for more than five minutes at a time. She further explained that she could stand for an hour or two but then needed to rest. She described her second most serious problem as concentration, explaining that her lack of focus was related to how much attention she had to pay to the pain and the dosage of medication needed to control the pain. When asked by the ALJ if she had anxiety or depression, she testified that she had more anxiety than depression but was not seeking treatment for her anxiety. Carrelli also testified that she had been taking continuing education courses for nursing; had a driver's license and had driven in the past month; liked to read; did stretching exercises every morning; and tried to walk at a track three times per week. Finally, she stated that she took an hour-long bath every night to relax her muscles.

Next, the ALJ asked a vocational expert ("VE") what work was available for a person of Carrelli's age, education, and vocational background, who was able to perform light work with a sit-stand option; no pushing or pulling or leg controls with the right leg; only occasional lifting and carrying with the left arm; no climbing or crawling; and only occasional stopping or bending. The VE responded that such a person could not perform Carrelli's past work as a registered nurse but could perform other jobs such as a medical unit clerk, a medical companion, or a general clerk. The VE explained that medical companion jobs involve no lifting but entail sitting with an ill person,

monitoring her position, and notifying other personnel if assistance is required. Later, Carrelli's attorney asked whether a person could perform medical unit clerk work if the person had difficulty remaining alert or was easily distracted. The VE responded that it would depend on the severity of those limitations. Carrelli's attorney also asked the VE if a person who missed more than two days of work per month was employable; the VE responded that "[g]enerally, over two absences, consistently, per month, is the cutoff point." (AR 755.)

In addition to the testimony offered during the administrative hearing, a surveillance tape of Carrelli was admitted as part of the record. The tape is also evidence in litigation between Carrelli and a private disability insurer. The tape was submitted at the ALJ's request.

### 2.    *The ALJ's decision*

The ALJ found that Carrelli had severe impairments of right piriformis syndrome, with piriformis-release surgery in March 2007; history of left shoulder impingement syndrome, with left shoulder arthroscopy and rotator cuff repair in March 2004; and minimal disc bulging in her lower back. The ALJ also found that Carrelli does not have a severe mental impairment. The ALJ then concluded that Carrelli's physical impairments limited her to a restricted range of light work with a sit-stand option. The ALJ further found, based on the VE's testimony, that there were jobs Carrelli could perform, such as medical unit clerk, medical companion, and general clerk.

### 3.    *District court's decision*

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Carrelli timely filed a civil action in the United States District Court for the Eastern District of Tennessee for review of the ALJ's decision. The magistrate judge found there was substantial evidence for the ALJ's decision and recommended

affirming. The district court agreed and adopted the magistrate judge's report and recommendation.

Carrelli timely appealed.

## II. ANALYSIS

### A. Standard of review

Under 42 U.S.C. § 405(g), our review of the Commissioner's decision is limited to determining whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* We may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). If supported by substantial evidence and decided under the correct legal standard, the Commissioner's decision must be affirmed even if this Court would decide the matter differently, and even if substantial evidence also supports the claimant's position. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

### B. Legal framework for evaluating disability claims

"The plaintiff has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability . . . ." *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Social Security Administration defines a "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make a determination as to disability, an ALJ undertakes a five-step sequential evaluation mandated by regulation. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. pt. 404, Subpt. P, App. 1, she is deemed disabled. § 404.1520(a)(4)(iii). If not, the ALJ fourth determines whether, based on the claimant's residual functioning capacity ("RFC"), the claimant can perform her past relevant work, in which case the claimant is not disabled. § 404.1520(a)(4)(iv). If so, the ALJ fifth determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. § 404.1520(a)(4)(v). The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Wilson*, 378 F.3d at 548 (citing *Walters*, 127 F.3d at 529). To prevail at step five, the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

Carrelli argues that the ALJ erred in two ways. First, she claims the ALJ erred at step two by finding that her anxiety disorder was not a severe impairment. Second, she argues that the ALJ erred at step five by concluding that she was capable of making a successful adjustment to other work and that such work is available.

**C.      Step two: severe mental impairment**

At step two, Carrelli must show that she suffers from a severe medically determinable physical or mental impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities."  § 404.1521(a).

Relying on the opinions of Dr. Allred and Dr. Welch, Carrelli argues that the ALJ failed to take account of her severe mental impairments.  As we have discussed, Dr. Allred concluded that Carrelli presented a "mixture of depression and anxiety symptoms." (AR 342.)  However, Dr. Allred found it difficult to determine the cause of Carrelli's anxiety—whether it was caused by mental-health symptoms or medical symptoms—because of the "circumstantial stresses" in Carrelli's life. (AR 342.)  In addition, although Dr. Allred concluded that some of Carrelli's mental abilities were limited due to anxiety, Dr. Allred further concluded that Carrelli was only "moderately limited." (AR 340.)  Dr. Welch came to a similar conclusion.  He opined that Carrelli could understand, remember, and complete detailed tasks on a regular and continual basis with only "occasional" difficulty sustaining concentration, persistence, and pace. (AR 353.)  We consequently conclude that, although Dr. Allred's and Dr. Welch's diagnoses might—with additional evidence—support the conclusion that Carrelli suffers a severe mental impairment, they do not necessarily lead to that conclusion.

Carrelli also relies on her history of using psychotropic drugs, including Ativan, Lorazepam, Zoloft, Cymbalta, and Ritalin, as evidence of her mental impairments.  Unfortunately for her, use of such drugs is not necessarily indicative of a severe mental impairment.  *See Thacker v. Sec'y of*

*Health & Human Servs.*, No. 90-5546, 1990 U.S. App. LEXIS 21866, at *7 (6th Cir. Dec. 12, 1990)

("The mere fact that claimant is taking medication to calm his nerves does little to establish mental

impairment."). Moreover, the record indicates that these drugs were prescribed for sedation, muscle

spasms, and sleeping. In fact, Carrelli told Dr. Allred that she used Lorazepam (commonly used to

treat anxiety), not for depression and anxiety, but for other medical purposes. Thus, her reliance on

her psychotropic drug-use falls short of conclusively demonstrating a severe mental impairment.

Moreover, there is evidence on the other side of the scale supporting the ALJ's determination.

First, other doctors reported that Carrelli suffered no mental impairments. Neurologist Dr. Scariano

concluded that Carrelli had "no significant affect distress, memory or concentration problems, or

problems with insight and judgment." (AR 376-77.) Dr. Summers also observed that Carrelli was

alert and oriented to person, place, time, and situation; her cognitive function and intelligence were

commensurate with her formal education; and she interacted well with him, with no abnormal

behaviors or mannerisms. Second, Carrelli's claims that she had difficulty concentrating and could

not follow a newspaper were inconsistent with her own testimony that she takes continuing education

classes to maintain her nursing license, cares for her teenage son, prepares simple meals, enjoys

reading, and drives. Third, the record shows that Carrelli has not sought treatment for her alleged

mental impairments. Although not dispositive, treatment that a claimant has received is a relevant

factor in evaluating the alleged intensity and persistence of her symptoms. *See* 20 C.F.R. §

404.1529(c)(3)(v). Finally, Carrelli herself attributes much of her anxiety to her physical condition.

During the administrative hearing, she testified that the anxiety and depression that she suffers is

related to pain. This self-assessment supports the ALJ's conclusion that Carrelli's anxiety was a

symptom of her physical impairment and not a separate disorder.

In the final analysis, we conclude that substantial evidence supported the ALJ's conclusion that Carrelli does not suffer from a severe mental impairment.

**D.     Step five: successful adjustment to other available work**

Carrelli also challenges the ALJ's conclusion that there were jobs available that Carrelli could perform. She launches this attack in three ways. First, she claims that the ALJ was predisposed to find against her. In other words, she claims he was biased. Next, she argues that the ALJ improperly ignored the opinions of her treating physicians. Finally, she claims that the ALJ devised inaccurate hypothetical questions.

*1.     Bias*

We apply the "presumption that policymakers with decisionmaking power exercise their power with honesty and integrity," and "any alleged prejudice must be evident from the record and cannot be based on speculation or inference." *Navistar Int'l Transp. Corp. v. U.S. EPA*, 941 F.2d 1339, 1360 (6th Cir. 1991). In addition, any claim of bias must be supported by a "*strong showing*" of bad faith. *City of Mount Clemens v. U.S. EPA*, 917 F.2d 908, 918 (6th Cir. 1980) (internal quotation marks omitted). Carrelli has offered no evidence to meet this high standard, and we easily reject her assertion.

*2.     Treating physicians' opinions*

As discussed, both Dr. Wakham and Dr. Naylor wrote letters and completed evaluation forms opining that Carrelli's ability to work was highly limited. Carrelli claims that the ALJ completely disregarded these opinions, but she misreads the decision. Contrary to her accusation, the ALJ did

not disregard the doctors' opinions; instead, the ALJ concluded that the opinions "grossly exaggerat[ed]" Carrelli's limitations, and the "ridiculously oppressive limitations" were inconsistent with the objective evidence of the record, clinical exam notes, Carrelli's reported daily activities, and the ALJ's observations of her at the administrative hearing. (AR 18, 21.) Thus, the ALJ did not disregard the opinions—he simply found them unpersuasive.

Carrelli also argues that the opinions of her treating physicians should have been given controlling weight. She is correct that an ALJ generally should give greater deference to a treating physician's opinion than to a non-treating physician's opinion. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (applying the treating-physician rule). However, an ALJ "must" give a treating source controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Blakley*, 581 F.3d at 406. Indeed, "'[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source . . . if it is inconsistent with the other substantial evidence in the case record.'" *Id.* (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9, at *5 (July 2, 1996)) (alteration in original). If, however, the ALJ does not accord controlling weight to a treating physician, the ALJ still must determine how much weight is appropriate by considering the record as a whole. *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(4) ("Generally the more consistent an opinion is the with the record as whole, the more weight we will give that opinion."); 20 C.F.R. § 404.1527(b) ("In deciding whether you are disabled we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive.").

The ALJ did that here. The ALJ first noted that the MRIs showed only "very miniscule" lower back disc bulging with no nerve root impingement, mild hypertrophy of the piriformis muscle, and a shoulder strain after holding a twelve pound turkey with only her left arm. (AR 18.) The ALJ then noted that Carrelli's pain decreased after her piriformis release surgery in March 2007, and that after her shoulder surgery in March 2004, she had good range of motion and only minimal tenderness. (*Id.*) The ALJ further noted the numerous diagnostic tests showing no physical or neurological abnormalities, including CT-scans, EMGs, MRIs, and nerve-conduction studies. (*Id.*) The ALJ then relied on Dr. Summers's finding that Carrelli had no neurological or musculosketal abnormalities, along with his assessment that Carrelli could lift twenty pounds and sit, stand, or walk for up to six hours, but no more than thirty minutes at a time. (AR 19.) The ALJ explained that he gave "considerable weight" to Dr. Summers's assessment because the assessment took account of Carrelli's left shoulder and hip pain but also was consistent with the benign diagnostic tests and Carrelli's reported and observed daily activities. (*Id.*) Moreover, as the ALJ noted, Dr. Gulbenk, an expert in Social Security disability evaluation, agreed with Dr. Summers' assessment. (*Id.*)

Consequently, we conclude that the opinions of Dr. Wakham and Dr. Naylor were inconsistent with the record as a whole, and the ALJ was not required to defer to their opinions.

### 3.    *Hypothetical questions*

Finally, Carrelli argues that the questions the ALJ posed to the VE did not accurately portray her mental and physical impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). In particular, she claims that none of the hypothetical questions took account of her mental impairments requiring the use of psychotropic drugs, the number of frequent absences

that her impairments would cause, and her need to be able to sit and stand at will. Carrelli further contends that when the VE considered these additional limitations, the VE testified that no jobs would be available for Carrelli.

An ALJ's hypothetical question to a VE must accurately portray a claimant's physical and mental impairments, but it is also "well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Here, our review of the record reveals that the ALJ properly incorporated his findings into the determination of Carrelli's RFC. The ALJ then presented Carrelli's RFC, along with her age, education, and past relevant work experience to the VE in hypothetical questions. The VE subsequently concluded that a number of jobs that Carrelli was able to perform existed.

Carrelli is correct that the VE testified that the identified jobs would be eliminated for a person who had difficulty remaining alert or for a person who was easily distracted, and the VE also testified that an employee with frequent absences would have trouble maintaining employment. But consideration of these additional factors is beside the point. When asked a hypothetical question encompassing the limitations that the ALJ found credible, the VE testified that jobs existed. The additional limitations offered by Carrelli's attorney—limitations that the ALJ found not credible—need not be considered. We therefore reject Carrelli's challenge.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.